Ricky D. DIXON, Appellant,

v.

The STATE of Texas, Appellee.

No. 12–89–00111–CR.

Court of Appeals of Texas,
Tyler.

Nov. 4, 1991.

Discretionary Review Refused
Feb. 26, 1992.

Ebb Mobley, Longview, for appellant.

C. Patrice Savage, Longview, for appellee.

RAMEY, Chief Justice.

Appellant was convicted on his plea of guilty to the charge of delivery of a penalty group I controlled substance. Punishment was tried to a jury and was assessed at twenty-five years in prison. We will affirm.

Nine points of error are raised on appeal. In his first three points appellant contends that the trial court erred in not quashing the jury panel after the prosecutor exercised two peremptory challenges against black members of the venire. He argues that the prosecutor exercised his peremptory strikes solely on the basis of race in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).[1]

The record reveals that appellant is a black man. The strike range in this case covered venire members one through thirty-six. Within that range there were three black potential jurors, No. 3: Karen Isaac, No. 5: Abner Harris, and No. 22: Clarence Bowie. When voir dire began, juror Isaac was not present. The prosecutor questioned the panel and explained his version of the case. There was little questioning of individual venire members by either party. Some fifteen or twenty minutes after the prosecutor's voir dire began, Isaac arrived in court. The prosecutor briefly questioned her about the range of punishment, specifically mentioning probation and appellant's lack of prior felony convictions. He had previously questioned the other members of the panel on those subjects.

During the appellant's voir dire, in response to an inquiry about whether anyone on the panel knew appellant's family, juror No. 22, Bowie, responded that, "I know his mother real well."

Following the parties' exercise of their peremptory strikes, appellant moved to

---

1. *Batson* was decided under the equal protection clause of the 14th amendment of the United States Constitution. Appellant's first point specifically raises that equal protection clause. His second point raises the equal protection clause of the Texas Constitution; the third point raises Tex.Code Crim.Proc.Ann. art. 35.261. The three points are argued together and therefore we will address them together.

have the jury panel quashed on the basis of *Batson*. The prosecutor was called to the stand by appellant. He testified that there were three black members of the venire within the strike range and that he had used nine of his ten peremptory challenges, including two against black members of the venire, Isaac and Bowie. Although appellant asked the trial court to take judicial notice of the strike lists, and the court agreed to do so, those lists are not in the record on appeal. At that point the appellant announced to the court that he rested on his prima facie case.

The prosecutor then testified that Isaac was the juror who had arrived fifteen or twenty minutes late and had missed most of his voir dire. He listed several reasons for striking Isaac, including her tardiness ("that is not a good indication for a strong State's juror for somebody that cannot even find the Courtroom at the time she's supposed to be there"), her age (twenty-one) being "younger than I would like to have on a jury, especially one where I'm looking for a strong punishment", her status as a single mother of a five year old child, her written representations on her jury card of no occupation, no employer, no present job, no duties or responsibilities, and her church preference as being Pentecostal. The prosecutor's rationale as to Isaac's religion was, "Helping me on my strikes was Ms. Becky Simpson, also Assistant District Attorney here in Gregg County. She talked to me about her experiences with jurors of the Pentecostal religion. She informed me that she has never taken a Pentecostal juror, that she has talked to jurors afterwards—or potential jurors, and they are very hesitant to render judgment on other persons. And that's not the type of religion I would want to have on the Jury, especially punishment type of jury, which I am attempting to go through at this time."

As to Bowie, the prosecutor testified that he had no complaint of this person as a juror until he stated that he knew the appellant's mother very well. He said until that response, he had intended to keep Bowie on the jury. However, in light of the trial being only on the issue of punishment, and the state seeking "stiff punishment", the prosecutor said that, "because of the fact he knows the [appellant's] mother very well, would probably be less inclined to give the [appellant] as stiff a punishment had he not known the [appellant's] mother so well."

On cross examination, the prosecutor testified that Isaac's marital status was not the sole reason for striking her; it was also her being unmarried with a young child. He indicated that he reviewed the venire list; he did not identify anyone else within the strike zone that was single with a child. Furthermore, he said that he had found no one else within the strike zone that was unemployed or of the Pentecostal religion. No additional evidence was offered by either side. Both rested.

In overruling the motion to quash, the trial judge said:

"The strike as to Jury Panel Member number 3, Karen Denise Isaac, was based on a number of factors stated in this record, including the fact that juror was at least fifteen minutes finding this Courtroom, which is not a sign of paying attention or being ideal for deciding someone's fate, together with being a single parent, unmarried, and not employed. All of those are deemed, I believe, by the law to be valid factors in the use of a strike. And it was not based upon the race of the prospective [sic] juror. Number 5, Abner J. Harris, is a black female who was not struck by either the State or the Defendant. Then 22, Clarence Bowie, the reason stated is that he knew the Defendant's mother. And the only contested issue in this case being the proper punishment, this being a plea of guilty to the Jury, that would seem to be a proper factor that he might find himself in that position of being difficult to render a judgment in the high end of punishment because of that acquaintanceship with the Defendant's mother. And for that reason, it appears that the strike is not based at all on the race of Jury Panel Member Number 22."

■ In order to invoke the protections promised by *Batson*, a defendant must establish a prima facie case of discrimination. This he can do by showing that he is a member of a cognizable racial group, that the prosecutor exercised peremptory challenges to eliminate members of the defendant's race from the jury, and any other facts or circumstances raising an inference of discrimination in the exercise of peremptory strikes. *Tennard v. State*, 802 S.W.2d 678, 679 (Tex.Cr.App.1990). Once the defendant has done that, the burden shifts to the state to articulate a neutral explanation for exercising its peremptory strikes. *Lewis v. State*, 815 S.W.2d 560, 563 (Tex.Cr.App.1991). However, the ultimate burden of production and persuasion remains with the defendant to show by a preponderance of the evidence that the allegation of purposeful discrimination is true. *Williams v. State*, 804 S.W.2d 95, 97 (Tex.Cr.App.1991); *Tennard*, 802 S.W.2d at 681.

■ On appeal, we employ a "clearly erroneous" standard of review. If the trial judge's findings are supported by the record, they will not be disturbed by this Court. *Hernandez v. State*, Slip op. at 17, 819 S.W.2d 806, —— (Tex.Cr.App.1991); *Tennard*, 802 S.W.2d at 681. We must determine whether, after viewing the record in the light most favorable to the trial court's ruling, the racially neutral explanations offered by the State have been overcome by the defendant. *Williams*, 804 S.W.2d at 101.

Keeping in mind that the trial was for the sole purpose of determining punishment, we conclude that the record does support the trial judge's decision that the appellant had not shown by a preponderance of the evidence that the prosecution's peremptory strikes against venirepersons Isaac and Bowie were the consequences of purposeful discrimination. The record shows that of the thirty-six venirepersons within the strike range, three were of the same race as appellant. Of the twelve jurors impaneled on the petit jury, one was black. Thus, the same proportion of blacks was ultimately seated on the jury as was available from the venire. The prosecutor did not exercise all of the strikes allotted to him.

■ As to Isaac, the prosecutor's articulated reasons for striking her are supported by the record. Her tardiness in appearing is evident. Although appellant criticizes the prosecutor's statement that "she could not even find the Courtroom at the time she's supposed to be there," [2] the point of the prosecutor's objection to her was that her tardiness suggested that she would not be a good juror for the state. Another explanation offered by the prosecutor for striking Isaac was her youth. Age has been recognized as a legitimate reason for striking a potential juror. *See Silva v. State*, 800 S.W.2d 912, 915 (Tex. App.—San Antonio 1990, no pet.); *Moss v. State*, 790 S.W.2d 731, 732 (Tex.App.—Houston [14th Dist.] 1990, no pet.). Her status as a single mother with a young child, standing alone, is not discriminatory. The appellant has not shown that any other single mothers were on the panel. Even if the strike for this reason was based upon a hunch, strikes may permissibly be based upon the prosecutor's hunches and past experience, so long as the actual motive is not racial discrimination. *Keeton v. State*, 749 S.W.2d 861, 865 (Tex.Cr.App.1988). Lack of employment, also given as a reason for striking Isaac, has been recognized as a legitimate basis for striking a potential juror. *See Hernandez v. State*, 808 S.W.2d 536, 544 (Tex.App.—Waco 1991, no pet. hist.); *Silva*, 800 S.W.2d at 914–915. The final reason offered by the prosecutor for striking Isaac was her Pentecostal religion. His explanation was predicated upon advice from his co-counsel. The explanation was

---

**2.** He opines that her tardy arrival "could well have been due to misdirection, error in court designation, clerical error, or any number of causes unrelated to her ability to find the Courtroom." However, none of those suggestions is supported by the record. In the absence of evidence to the contrary, we must assume that the trial judge, who, in his role of supervising the voir dire, conducted the trial and observed the relevant circumstances, found none of the suggested causes. *See Hernandez v. State*, 808 S.W.2d 536, 543 (Tex.App.—Waco 1991, no pet. hist.).

related to the purpose of the trial, *i.e.*, judging and punishing appellant. We find that the prosecutor stated racially neutral reasons for striking juror Isaac.

█ Although appellant's argument is limited to Isaac, we also note that the peremptory strike of venireman Bowie was for a legitimate, racially neutral reason. Close personal acquaintance with defendant's family member has been recognized as a racially neutral reason for exercising a peremptory strike. *See e.g., DeBlanc v. State,* 799 S.W.2d 701, 711–713 (Tex.Cr.App.1990).

█ Appellant had the burden of affirmatively proving that the prosecutor's racially neutral explanations were a pretext or sham. He must do more than simply state his disagreement with the prosecutor's reasons. *Lewis v. State,* 815 S.W.2d 560, 564 (Tex.Cr.App.1991); *Straughter v. State,* 801 S.W.2d 607, 613 (Tex.App.—Dallas 1990, pet. ref'd). He offered no additional evidence after the explanations were made. The record contains no evidence suggesting that the prosecutor's stated reasons were a sham. The trial court's action in overruling appellant *Batson's* objection was not erroneous. The first, second and third points of error are overruled.

In his next six points of error, appellant complains of testimony regarding items found during the execution of a search warrant following appellant's arrest. Specifically, appellant contends that the trial court erred in admitting evidence of police scanners and money found in the house from which appellant obtained the cocaine that was delivered to the undercover police officer. It is his position that the evidence of money and police scanners, admitted through the testimony of three police witnesses, was evidence of extraneous offenses and therefore inadmissible.

The record reveals that on the date of the offense to which appellant plead guilty, an undercover Longview police officer, Carlos Samples, went to a location in the city of Longview that was suspected of being a source of drug sales. The place was referred to by the police as the "Iron House" and by residents of the area as "The Hole."

Upon Officer Samples' arrival, appellant ran to Samples and asked if he could help him. Samples told appellant that he wanted to buy some cocaine. Appellant told Samples that, "[We] have anything you want." Samples and appellant then went through a gate in the wooden fence around the Iron House and walked to a door on the side of the house. The door was closed; it had a small hole in it. They discussed the price of the cocaine and at appellant's instruction, Samples gave appellant $65.00 for the purchase of the drugs.[3] Appellant knocked on the door and slid the money through the small hole. A small ziplock bag containing the drugs was then received from the small hole by appellant. Appellant asked Samples if he could have some of the drugs for helping make the deal, and the two walked out of the fenced area. Appellant was thereupon placed under arrest and taken into custody. At that point, other officers surrounded the house and a search warrant was sought. Approximately one hour was required to obtain the warrant and return to the house. The warrant was executed and the house searched. In the course of the search, the police located a listening system, several police scanners, radios and money. Approximately $600 to $700 was found in two locations in the house, one in the sock of the man found inside the house and one under a drawer in the bedroom dresser. The marked $65.00 from this purchase by Officer Samples was found with the money under the bedroom drawer.

Appellant filed a motion in limine seeking to prohibit reference to any conduct or offense of the accused "which would [be] extraneous to the primary offense for which [appellant] is on trial." At the point in officer Samples' testimony wherein he mentioned securing a search warrant, the jury was retired, and the objection was taken up outside of the jury's presence.

Samples testified that the only person inside the house at the time of the search

---

3. Samples testified that the money had been given to him by Officer Tim Eaton and that the money had been marked or the serial numbers recorded.

was one Willie Mann. In searching the house pursuant to the warrant, the police located a speaker system which was used to listen to people outside the door with the hole in it. Upon cross examination, Samples testified that appellant was outside the house during the transaction for which he was arrested and because of the fortifications of the house could not have then entered the house through the door through which the illegal transaction took place.

Appellant then objected that the attempt to introduce evidence of items found inside the house was unconnected to appellant, and therefore, was an extraneous offense. He further argued that any probative value of the evidence was outweighed by its prejudicial effect. The trial court then ruled that the jury was entitled to know the extent of the operation in which appellant was participating and overruled the objection. After some discussion about additional evidence of this nature that the state intended to offer, appellant informed the court that he "would like to have my objection as far as any testimony regarding police scanners and that type of material was found, or even oral testimony to it. And I would ask that my objection—." He did not include "money" in his objection. The trial court granted appellant his requested running objection. The jury was returned, and Samples continued his testimony.

On redirect examination, Samples testified that during the house search they found speakers in the gable of the house and also police scanners and radios. He explained that a police scanner was a radio that monitors the activity of police in the area by scanning police radio channels. Samples also testified that the money he had used to purchase the narcotics was found with other money. Again, no objection to that evidence was made.

The State next called Longview Vice and Narcotics Officer Tim Eaton. Eaton also testified about the search. He testified about the sound system and the fortifications of the house. He stated that they had found a large sum of money, six or seven hundred dollars, in Willie Mann's sock, and a similar sum under a dresser drawer in the bedroom. The money used by Samples to buy the cocaine was located under the drawer in the bedroom. On cross examination, Eaton testified that appellant was in custody when the search took place. No additional objections were made.

Randall Rieger, another Longview police officer involved in the arrest of appellant as well as the search of the Iron House, testified that in searching the house, they located "some suspected controlled substance, large quantity of money, some sound monitoring devices where they could listen to what was going on outside, *scanners*, walkie-talkies, a number of things." (Emphasis added).

■ In points of error five, seven and nine, appellant complains about the testimony concerning the finding of money during the search. The subject matter for which the trial court allowed a running objection was, "testimony regarding police scanners and that type of material." Appellant made no mention of money in either his motion in limine or his objection. In order for a specific objection to be preserved for review on appeal, the same objection raised on appeal must have been presented to the trial court. *Rezac v. State*, 782 S.W.2d 869, 870 (Tex.Cr.App. 1990). Appellant's points of error five, seven and nine do not comport with the objection raised in the trial court, and thus, present nothing for review. Points of error five, seven and nine are overruled.

In points four, six and eight, appellant complains that the testimony of the witnesses Samples, Eaton and Rieger concerning the police scanners that were found during the search was improperly admitted. He contends that this testimony impermissibly injected evidence of an extraneous offense.

■ We conclude that the references to finding police scanners during the search were not evidence of an "extraneous" offense. The possession or operation of police scanners is not illegal, nor is there any suggestion that such is "wrong" or an

"act" of misconduct. *See* Tex.R.Crim.Evid. 404(b). There are certain circumstances in which "extraneous offenses" may not be criminal offenses under the penal laws of the state, yet are included as such as extraneous acts or extraneous business transactions. *Plante v. State*, 692 S.W.2d 487, 490, 491 (Tex.Cr.App.1985); *Crawley v. State*, 513 S.W.2d 62, 65 (Tex.Cr.App.1974). Here, however, there is no separate event or offense introduced into evidence. Appellant asserts that "the obvious import of this testimony was to convey to the jury that appellant [was] involved in a large scale, sophisticated drug operation." Appellant's argument is that the existence of the scanners suggested a more comprehensive operation or activity than a single delivery of cocaine. It, however, does not introduce separate, distinct conduct by the appellant from the offense charged; here, the operation of police scanners is not an extraneous offense or event.

■ Furthermore, should the possession of police scanners constitute an "extraneous offense" under the Texas Rules of Criminal Evidence, evidence of "other crimes, wrongs, or acts" is admissible if it is shown to be relevant to some issue other than to prove the character of a person in order to show that he acted in conformity therewith" on a given occasion, and the trial court makes the determination that the danger of unfair prejudice does not substantially outweigh the probative value of the proffered evidence. *Montgomery v. State*, 810 S.W.2d 372, 386 (Tex.Cr.App. 1991) (opinion on rehearing). Under *Montgomery*, the trial court must first decide whether "the evidence tends in logic and common experience to serve some purpose other than character conformity to make the existence of a fact of consequence more or less probable than it would be without the evidence." *Id.* at 391. As long as the trial judge's determination of this question is within the zone of reasonable disagreement, this Court may not disturb that decision. *Id.*

In this case, the sole issue before the jury was punishment. The circumstances surrounding the offense were relevant to the issue of the appropriate punishment to be assessed. *Miller–El v. State*, 782 S.W.2d 892, 896 (Tex.Cr.App.1990). The purpose of the evidence was to aid the jury in understanding the whole criminal transaction and intelligently perform their function of deciding what punishment to assess. *Couret v. State*, 792 S.W.2d 106, 108 (Tex. Cr.App.1990); *Hoffert v. State*, 623 S.W.2d 141, 144–145 (Tex.Cr.App.1981).

Although appellant contends that he was not involved in the operations within the Iron House, the record is to the contrary. When Officer Samples arrived at the Iron House, appellant ran up to him and asked what he wanted. He told Samples that "we" have whatever you want. Appellant, not the customer, was the only person who had any direct contact with the operation in the House. Appellant was the only sales contact with the customer. Appellant knew and performed the correct procedure to secure the drugs through the barred door. Appellant thus being an integral and necessary part of the operation of the Iron House, the equipment found within the House during the search was relevant to the appellant's offense apart from character conformity. The trial court did not abuse its discretion in finding that the evidence was relevant.

Since appellant did object that the police scanner evidence was highly prejudicial, we will consider the second prong under *Montgomery*, which requires the trial judge to balance the potential for unfair prejudice against the probative value of the evidence. *Id.* at 389. In making this determination, it is presumed that relevant evidence will be more probative than prejudicial. *Id.* Criteria to be used in making this balancing analysis include the inherent probity of the evidence, the strength of the proponent's evidence that the opponent committed the extraneous conduct, the potential of the evidence to impress the jury in some "irrational but nevertheless indelible way", the amount of time needed to develop the extraneous conduct, and the proponent's need for evidence of the extraneous conduct. *Id.* at 389–390. Only if the potential for unfair prejudice *substantially* outweighs the probative value of the evidence, should

the trial court exclude it under Rule 403. We must decide whether "relevant criteria, viewed as objectively as possible, lead to the conclusion that the danger of unfair prejudice substantially outweigh[s] the probative value of the proffered evidence." *Id.* at 392. The relevant criteria employed by this court include (1) whether the ultimate issue was seriously contested by the opponent of the evidence; (2) whether the state had other convincing evidence to establish the ultimate issue to which the extraneous conduct was relevant; (3) whether the probative value of the evidence was not particularly compelling, and, (4) whether the nature of the extraneous conduct was such that an instruction to consider the evidence only for its proffered purpose would likely have been effective. *Id.* at 392–393.

The evidence consists of Officer Samples' statement that police scanners were found in the house and his description of scanners as radios that monitor police activity, together with Officer Rieger's inclusion of "scanners" in his listing of objects found in the search of the house. Considering the nature of the evidence in question, and the relevant criteria set out above, we conclude that the evidence of police scanners bore little risk of unfair prejudice. *See Crawley*, 513 S.W.2d at 65.

Point of error number six is overruled because the record shows that the witness Eaton made no mention of the evidence of which appellant complains. Points four and eight are overruled because the evidence was relevant to punishment as a circumstance relevant to the offense, and the risk of unfair prejudice did not substantially outweigh the probative value of the evidence.

■ Furthermore, even the testimony of police scanners did inject a risk of unfair prejudice that substantially outweighed the probative value of the evidence, we, nevertheless, conclude that no reversible error resulted. The standard by which we determine whether error justifies reversal is whether we can say beyond a reasonable doubt that the erroneously admitted evidence made no contribution to the punish-

ment assessed. Tex.R.App.P. 81(b)(2). The sole jury issue was the punishment to assess for appellant's commission of the offense. The evidence concerning police scanners was indeed limited. Other evidence, not the subject of an objection concerning the nature and operation of the Iron House, its contents and fortifications, was far more prominent in the record than the mention of police scanners.

Several law enforcement officers testified without contradiction that appellant's reputation for being law-abiding was bad and that their opinion of appellant as a law-abiding citizen was bad. Appellant's sister testified on appellant's behalf; she stated that she was not asking that appellant be given probation. She testified that he had not been employed for two years and that she was not aware that he had any income. By her statement that she wanted appellant to get help, she implicitly expressed the opinion that appellant had a problem with drugs. The prosecutor did not mention police scanners or other fruits of the search in his argument. Although appellant asked the jury to recommend probation, the prosecutor asked for a thirty year prison term. The jury assessed twenty-five years. We conclude from our review of the record, that beyond a reasonable doubt, the testimony that police scanners were found in the Iron House when it was searched after appellant had been arrested, made no contribution to the punishment assessed. Tex.R.App.P. 81(b)(2).

The judgment of the trial court is affirmed.